**James T. LAZAR, George L. Rogers, and M. B. Gibson, Plaintiffs,**

**v.**

**Ezra Taft BENSON, Secretary of Agriculture of the United States, Commodity Credit Corporation, Flue-Cured Tobacco Cooperative Stabilization Corporation, H. H. Gregory and Ray Baker, t/a Gregory's Warehouse; Thomas C. Bethea and Alpheus V. Bethea, t/a The Big Tin Warehouse; and Twin State Warehouse, a corporation, Defendants.**

**Civ. A. No. 6391.**

United States District Court
E. D. South Carolina,
Florence Division.

Sept. 11, 1957.

260

J. Bourke Bilisoly, Wendell, N. C., McEachin, Townsend & Zeigler, E. N. Zeigler, Florence, S. C., M. E. Cavendish, Greenville, N. C., W. B. Norton, Marion, S. C., for plaintiffs.

Thomas P. Simpson, Asst. U. S. Atty., Charleston, S. C., Gerald O'Rourke, Jr., Office of Gen. Counsel, Dept. of Agriculture, Washington, D. C., William T. Joyner, Raleigh, N. C., for defendants.

WILLIAMS, District Judge.

Plaintiffs, each of whom reside within the Florence Division, Eastern District of South Carolina, and are engaged in the raising of tobacco, commenced this action by the filing of a verified complaint on August 21, 1957. Based upon the allegations of this verified complaint,

this Court issued a rule to show cause returnable August 27, 1957, requiring the defendants to appear and show cause why an order should not issue enjoining the defendant warehousemen from attaching distinguishably different warehouse tickets certifying which varieties of tobacco were receiving full support and which were not and from enforcing certain provisions of the warehousemen's contract with defendant Flue-Cured Tobacco Cooperative Stabilization Corporation.

At the time set for hearing of the above referred to rule, a special appearance was made on behalf of the defendant Ezra Taft Benson, Secretary of Agriculture, and Commodity Credit Corporation and a motion to dismiss, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A., was made upon the following grounds:

"1. To dismiss the action on the ground that the Court lacks jurisdiction over the subject matter because: (a) an original order in the nature of mandamus cannot be issued by this Court, or any District Court other than the District Court of the District of Columbia; (b) that this is an action against the sovereign to which consent has not been granted.

"2. To dismiss the action on the ground that the Court lacks jurisdiction over the person of Ezra Taft Benson, Secretary of Agriculture, because: (a) such defendant does not reside in the Eastern District of South Carolina; (b) the required personal service on the Secretary of Agriculture has not been made.

"3. To dismiss the action on the ground of improper venue because, under 28 U.S.C. § 1391(b), an action wherein jurisdiction is not founded solely on diversity of citizenship shall be brought only in the judicial district where all defendants reside and the residence of the Secretary of Agriculture, in his official capacity, is the District of Columbia.

"4. To dismiss the action on the ground of lack of jurisdiction of the person of Ezra Taft Benson, Secretary of Agriculture, because of insufficiency of process, due to the fact that personal service has not been made on the Secretary of Agriculture.

"5. To dismiss the action on the ground of insufficiency of service of process because personal service has not been made on the Secretary of Agriculture and the only service attempted was through the mails.

"6. To dismiss the action on the ground that there has been a failure to join an indispensable party because the action is an attack upon the regulations and program of the Secretary of Agriculture, necessitating that the Secretary of Agriculture be a party to the action and, as stated in Paragraphs Nos. 2 through 5 of this Motion, the Secretary of Agriculture has not been made a party to this action.

"7. To dismiss this action on the ground that the plaintiffs failed to state a ground upon which relief can be granted because: (a) an original order in the nature of mandamus cannot be issued by this Court; (b) the Secretary of Agriculture is an indispensable party and he has not been made a party to this action; (c) this is in effect an unconsented to suit against the United States; (d) Commodity Credit Corporation, by express statutory provision, is immune from injunction or other similar process."

Upon hearing arguments of counsel for both sides, this Court decided to take the motion to dismiss under advisement and heard testimony with respect to the rights of the plaintiffs to a temporary injunction.

### Findings of Fact

1. That the official residence of Ezra Taft Benson in his capacity of Secretary of Agriculture of the United States is the District of Columbia.

2. That this action is an attack upon the lawfulness of the program and regulations of the Secretary of Agriculture, particularly with reference to his actions in connection with the price support program for 1957 flue-cured tobacco..

3. That Commodity Credit Corporation is not subject to injunction or other similar process.

4. Prior to the 1955 tobacco marketing year, the flue-cured tobaccos produced in this country were of full-bodied, full-flavored and aroma varieties; however, beginning with the 1955 tobacco marketing year, and in progressively increasing quantities in the 1956 marketing year, several varieties of flue-cured tobacco, which were of light body and lacking flavor and aroma, began to appear in the commercial markets. Such light-bodied tobaccos were known as Coker 139, Coker 140, and Dixie Bright 244.

5. Historically some one-third to more than one-half of this country's production of tobacco has been consumed by the export trade who desire the full-bodied, full-flavor and aroma tobaccos which are produced only in this country and in no other country of the world.

6. Foreign buyers of tobacco have available to them in foreign countries all needed supplies of light-bodied tobacco which lacks the flavor and aroma traditionally found in the standard American varieties and these foreign buyers can obtain such light-bodied tobaccos at less than one-half of the net cost to them of the American produced light-bodied tobaccos.

7. The new American produced light-bodied tobaccos simulate in appearance the various long-established standard American varieties but lack the flavor and aroma found in such standard varieties.

8. The grading of tobacco, under the Tobacco Inspection Act (7 U.S.C.A. § 511 et seq.), is based entirely on characteristics visible to the naked eye and the presence or absence of flavor and aroma is not a grading factor and cannot be

established as a factor in the traditional marketing procedures followed in the tobacco industry.

9. Beginning with the 1955 tobacco marketing year and continuing with increasing intensity thereafter, the United States Department of Agriculture and American tobacco producer and tobacco trade associations received complaints from foreign and domestic buyers and companies that the new light-bodied American produced tobaccos lacked the flavor and aroma traditionally associated with American tobacco and that such new varieties, which were identified by the complainants as Coker 139, Coker 140, and Dixie Bright 244, were not wanted by foreign tobacco buyers and companies.

10. In making complaints, foreign tobacco buyers and companies served notice that the new varieties, Coker 139, Coker 140 and Dixie Bright 244, could not be identified from standard American varieties on the auction warehouse floor in the cured leaf form and that, unless steps were taken to discourage the production of these new varieties of tobacco and to encourage the production of standard American tobaccos and to distinguish the new varieties from the standard American varieties on the auction warehouse floors, the foreign buyers and companies would cease buying American tobaccos.

11. The failure to distinguish on the warehouse floor between the full-bodied, full-flavor and aroma standard American tobaccos and the new light-bodied American tobaccos would result in depressing the marketing prices for tobacco generally because of the efforts of tobacco buyers and companies to offset the loss resulting to them by the inadvertent purchase of such new varieties by reducing the price which they would pay for any and all American tobaccos.

12. In the 1956 tobacco marketing year, the Department of Agriculture attempted to distinguish between the standard American full-bodied tobaccos and the new light-bodied tobaccos by the establishment of several new grades under the Tobacco Inspection Act but,

since there is no conclusive relationship in appearance characteristics of tobacco and its flavor and aroma, tobacco buyers and companies found themselves unable to rely upon such grading system and refused to purchase any tobacco which they believed might be of the light-bodied varieties—Coker 139, Coker 140 and Dixie Bright 244.

13. The quantities of tobacco coming under Commodity Credit Corporation's 1955 and 1956 Tobacco Loan Programs, because of the buyers' unwillingness to purchase any tobacco which they believed might be of the light-bodied varieties, caused the Government's loan stocks of tobacco to reach their highest point since the inception of the Tobacco Loan Program and it is an economic fact that over-large inventories of any commodity have a depressing effect on the price of such commodity.

14. The unwillingness of the tobacco buyers and companies to purchase any tobacco which they believed might be of the new light-bodied varieties resulted in a general depressing effect upon the tobacco market, penalizing all producers of the standard American varieties desired by foreign and domestic tobacco buyers and companies.

15. After full consideration of the destructive effect being had upon the American tobacco market by the increasing heavy production of Coker 139, Coker 140 and Dixie Bright 244 and the inability to distinguish between these varieties and the standard American varieties on the auction warehouse floor, the United States Department of Agriculture held numerous conferences and otherwise solicited the views and recommendations of all segments of the tobacco industry concerned, all of which asked that immediate steps be taken to discourage the production of such light-bodied varieties which were identified as Coker 139, Coker 140 and Dixie Bright 244, to encourage the production of full-bodied standard American varieties and to distinguish between the full-bodied and light-bodied varieties on the auction

warehouse floors in order that buyers could purchase with confidence.

16. The program, which the United States Department of Agriculture determined to put into effect to stabilize the prices of tobacco, to promote the orderly marketing of tobacco and preserve for the American tobacco producer his export markets, was announced to the tobacco industry and the public generally by that Department's press release dated December 18, 1956, which stated in part as follows:

"Major changes in the 1957 flue-cured tobacco price support program —changes which are expected to discourage production of varieties viewed as undesirable under present demand conditions and to encourage an increase in the proportion of the crop having characteristics currently in demand—were announced today by the U. S. Department of Agriculture.

"Today's changes, which are in accord with recommendations of grower organization and industry leaders in the flue-cured tobacco area, are as follows:

"(1) 1957-crop flue-cured tobacco of varieties '139', '140', and '244' irrespective of grade, will be supported at one-half the support rates for comparable grades of other varieties.

"(2) Price support rates for individual grades of all flue-cured varieties will be adjusted to reflect current demand patterns. This action will support a program to encourage growers to follow cultural practices that will increase the proportion of the crop which has desirable flavor and aroma characteristics.

"The three varieties viewed as currently undesirable have been classified by Federal and State scientists of the flue-cured tobacco area as 'low to lacking in flavor and aroma, generally of light body,

and/or currently with poor acceptance in the trade.' "

Copies of such press release were mailed by representative agencies of the Department of Agriculture to each tobacco producer in the United States. By press release dated January 9, 1957, the Department of Agriculture further explained the program which it had entered upon, stating in part as follows:

"Rigid enforcement of its announced 50-percent cut in price support on 1957 production of flue-cured tobacco varieties Coker 139, Coker 140, and Dixie Bright 244 was emphasized today by the U. S. Department of Agriculture. * * *

"Commenting on the Department's enforcement plans, Assistant Secretary of Agriculture Marvin L. McLain, said: 'We expect to spare no reasonable effort to carry out the purposes and intent of the variety discount program.' "

Further notice was given by press release dated April 26, 1957, wherein it was repeated that Coker 139, Coker 140, and Dixie Bright 244 would be supported at one-half the rate of comparable grades of other varieties of American tobaccos and that these three varieties had been determined to be lacking in flavor and aroma and had poor acceptance in the trade. On May 10, 1957, consistent with the notice given in the press release of January 9, 1957, that the Department would rigidly enforce its program with respect to Coker 139, Coker 140, and Dixie Bright 244, and that it would spare no reasonable effort to carry out the purpose and intent of the program, the Department announced that acceptable varieties of flue-cured tobacco, that is, those other than Coker 139, Coker 140, and Dixie Bright 244, would be identified on the auction warehouse floors for the reason as follows:

"* * * in order to instill confidence in buyers, stimulate prices on the market, and protect the price support program."

The press release of May 10, 1957, further stated:

"The floor identification plan was developed in cooperation with committees representing the Bright Belt Warehouse Association and the South Carolina Warehouse Association. Under the plan, auction warehouses will use regular basket tickets to identify baskets of tobacco 'certified' as from farms that produced none of the undesirable varieties but will use special, distinguishably different tickets to identify all baskets which are not so 'certified'."

17. The regulations of the Department of Agriculture pertaining to its variety identification program appeared in the Federal Register of May 7, 1957 (22 F.R. 3201), in the form of a notice of proposed rule making, wherein all aspects of the program, excepting the actual level of support, and the matter of identification on warehouse floor which had not yet been determined upon was set out in detail and in the last paragraph of such notice of proposed rule making there appeared the statement as follows:

"Prior to the final adoption and issuance of these regulations, consideration will be given to any data, views, and recommendations pertaining thereto which are submitted in writing to the Director, Tobacco Division, Commodity Stabilization Service, United States Department of Agriculture, Washington 25, D. C. All submissions must be postmarked not later than ten days after date of publication of this notice in the Federal Register in order to be considered."

Pursuant to the notice of proposed rule making so given, there appeared in the Federal Register of June 11, 1957 (22 F.R. 4064), the terms of the variety identification program and this regulation, like the notice of proposed rule making previously given, showed that such program had been entered upon in connection with the Department's responsibilities under the price support legislation and there was cited for legal authority in both such Federal Register publications, The Agricultural Act of 1949, 63 Stat. 1051 et seq., 7 U.S.C.A. § 1421 et seq. Thereafter, there appeared in the Federal Register of July 9, 1957 (22 F.R. 4777), the full terms of the 1957 Tobacco Loan Program, including the provisions with respect to the variety identification program through the successive stages of production from the green plant growing in the field through the marketing on the tobacco auction warehouse floor. In addition to the press releases and regulations of the Department of Agriculture with respect to the identification of varieties on the warehouse floor, beginning in the early months of 1957, it was generally known in all segments of the tobacco industry, through conferences participated in by representatives of the Department of Agriculture, that the Department believed it necessary, and was working out the details, to differentiate the standard varieties from the reduced support rate varieties on the warehouse floor.

The Tobacco Loan Programs in the flue-cured tobacco area are carried out by the Commodity Credit Corporation, on behalf of the Secretary of Agriculture, through contracts between such Corporation and the Flue-Cured Tobacco Cooperative Stabilization Corporation, Raleigh, North Carolina, and such contracts require that the contracts entered into between Stabilization and auction warehousemen through which the tobacco price support program is made available to producers, be approved by Commodity Credit Corporation.

18. Consistent with the variety identification program the Department of Agriculture required that contracts between Stabilization and the auction warehousemen participating in the price support program, contain provisions requiring differentiation on the warehouse floor between standard varieties and the reduced support varieties—Coker 139, Coker 140, and Dixie Bright 244.

19. Not more than one-half of one percent of the tobacco producers in the United States have intentionally or in-

advertently grown limited support varieties and the average of prices being received by American tobacco producers during the 1957 marketing season exceed price support levels and are the highest in history. The requirement that the traditional varieties be distinguished from the new light-bodied varieties on the warehouse floors is a substantial contributing factor.

20. The quantity of tobacco coming under the 1957 Tobacco Loan Program is the lowest in history—approximately three percent or less of the total production.

21. A level of support for Coker 139, Coker 140 and Dixie Bright 244 of 50% of the level of support for standard varieties of comparable grades represents a support rate of 90% of parity for such three named varieties and the net amount which will accrue to the producers who have limited support varieties is not ascertainable since the Department of Agriculture has instituted special pools through which all such tobacco coming under the price support program will be merchandised in such manner as to realize any recoverable value in the tobacco in excess of the amount of the price support loan advanced to the producer.

22. The attaching, on the warehouse floor, of distinguishably different warehouse tickets to the standard varieties and the reduced support varieties is done by the warehousemen or his employee and such action does not constitute a grade determination. The grade determination is made by a U.S.D.A. Tobacco Inspector under the Tobacco Inspection Act and is entered on that portion of the already attached warehouse ticket reserved for such purpose.

23. The only effect of distinguishing on the auction warehouse floor between standard American Varieties of tobacco and the new light-bodied varieties— Coker 139, Coker 140 and Dixie Bright 244—is to cause such new varieties to compete against the standard varieties.

## Conclusions of Law

■■■ It is a well-established rule of law that the official residence of executive officers of the United States Government is the District of Columbia and in order for a District Court to acquire jurisdiction there must be personal service upon the executive officer. In the case of Nesbitt Fruit Products, Inc., v. Wallace, Secretary of Agriculture et al., D.C., 17 F.Supp. 141, an attempt was made to sue the then Secretary of Agriculture, in the district where he was an inhabitant as a private individual. In granting a motion to quash service and to dismiss the complaint the Court said:

"If we are going to recognize an official residence as a proper place of inhabitance to give the federal courts jurisdiction, there can be no escape from the natural conclusion that in all proceedings brought against the Secretary of Agriculture growing out of the conduct of his office, the same must be brought in the District of Columbia and not in the district in which he has his private residence.

"The plaintiff here, however, claims its petition sets out a personal cause of action against the defendant Henry A. Wallace, in that it charges that he acted outside the scope of his authority and thereby makes the place of his personal residence a proper one for bringing the suit.

"Upon a close analysis of the bill of complaint, however, it can hardly be said that the bill alleges that the Secretary acted without the general scope of his authority. It is true that when a public officer goes outside the scope of his duty he is not entitled to protection on account of his office, but is liable for his acts like any private individual. But the duties of a public office include those lying squarely within its scope, those essential to the accomplishment of the main purpose for which the office was created, and those which, al-

though only incidental and collateral, serve to promote the accomplishment of the principal purposes. So, although a public officer in performing an act within the general scope of his authority commits an error or even abuses the confidence which the law reposes in him, he is nevertheless still acting virtute officii. 46 C.J. §§ 301, 308, 327.

"Two recent decisions by District Judges find that executive officers of the United States Government are subject to suit only at the place of their official residence. Smith v. Farley, as Postmaster General [38 F.Supp. 1012], Southern District of New York, Judge Hulbert, dated April 23, 1936, and three cases against Harry L. Hopkins, Administrator Works Progress Administration, Southern District of New York, by Judge Clancy, dated September 3, 1936.

"Having carefully considered the several cases cited by both the plaintiff and defendant in their briefs, I am satisfied that, following the Butterworth decision, the Secretary of Agriculture is an inhabitant of the District of Columbia for all purposes within the general scope of his official acts, and under the limitations of section 112, title 28 U.S.C. (28 U.S.C.A. § 112), suit may not be maintained against him over his objections in any other district. On the other hand, if the acts complained of are outside the general duties of his office, suit then may only be brought against him in the district where he is an inhabitant as a private individual. Finding that the complaints against him in the bill are with reference to acts done in his official capacity, it follows that over his objections the suit may not here be maintained and that the motion to dismiss as to the defendant Henry A. Wallace, Secretary of Agriculture, should be and the same is hereby sustained, and the subpoena quashed and the suit dismissed."

The Court of Appeals for the Fourth Circuit had occasion to pass on the question of jurisdiction over executives of the United States Government in the case of Berlinsky v. Woods, 178 F.2d 265, 267, where in an opinion by Judge Soper it stated:

"(1) The District Court did not have jurisdiction over the Housing Expediter because his official residence is in Washington, in the District of Columbia, and the attempted service of process upon him in the District of Columbia was ineffective to confer jurisdiction upon the court. Butterworth v. Hill, 114 U.S. 128, 5 S.Ct. 796, 29 L.Ed. 119; Federal Landlords Committee, Inc., v. Woods, D.C.S.D.N.Y., 9 F.R.D. 622."

The most recent decision on this point arose in the Court of Appeals for the Ninth Circuit in the case of Ernst v. Secretary of the Interior, 244 F.2d 344, 345, in which the plaintiff commenced suit in the District Court of Alaska and the only service attempted was by mail as to the Secretary of Interior and by leaving a copy with the United States Attorney in Alaska. The Court in quashing service and dismissing the complaint stated:

"The order to quash and dismiss the case as against the Secretary and the Solicitor was clearly correct inasmuch as the court lacked jurisdiction of those officers. Their official residence is in Washington, D. C. The governing statute (28 U.S.C.A. § 1391(b) provides that 'a civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, except as otherwise provided by law.' There is no statutory authority for instituting suit against these officials elsewhere than in their place of residence."

■ The Courts have consistently held that where an action seeks to attack the directives and regulations of an executive of the United States Government or attempt to require him to take action in the exercise of his statutory powers, such executive is an indispensable party, without whom the action cannot continue. In the case of Berlinsky v. Woods, 178 F.2d 265, quoted from above the plaintiff alleged that the landlords had not complied with the rent regulations and that the Housing Expediter had arbitrarily and unlawfully failed to act in plaintiff's behalf. Plaintiff sought by his prayer to have the Court order the Housing Expediter to carry out his duty under the federal statute and to prohibit the Sheriff of Baltimore City from evicting the plaintiff from the property. The Court in affirming the action of the District Court of dismissing the complaint stated:

"(2) Since the power to administer the Housing and Rent Control Act of 1947, as amended, was lodged in the Housing Expediter under Sections 204 and 206, 50 U.S.C.A. Appendix, §§ 1894, 1896, and the purpose of the suit is to require him to take action in the exercise of his statutory powers, he is an indispensable party to the suit which cannot go on without him; and the case must therefore also be dismissed as to the Area Rent Director and the Sheriff of Baltimore City. Jacobs v. Office of Housing Expediter, 7 Cir., 176 F.2d 338; Williams v. Fanning, 332 U.S. 490, 493, 68 S.Ct. 188, 92 L.Ed. 95."

In Gnerich v. Rutter, 1924, 265 U.S. 388, 391, 44 S.Ct. 532, 533, 68 L.Ed. 1068, involving a suit for an injunction to direct the actions of the Prohibition Commission and the Prohibition Director under the regulations of the Commissioner of Internal Revenue, the Supreme Court stated the compelling reasons why the head of the agency is an indispensable party in any suit attacking the regulations of such official:

"The act and the regulations make it plain that the prohibition commissioner and the prohibition director are mere agents and subordinates of the Commissioner of Internal Revenue. They act under his direction and perform such acts only as he commits to them by the regulations. They are responsible to him and must abide by his direction. What they do is as if done by him. He is the public's real representative in the matter, and, if the injunction were granted, his are the hands which would be tied. All this being so, he should have been made a party defendant—the principal one—and given opportunity to defend his directives and regulations."

■ A writ of injunction cannot issue as against Commodity Credit Corporation since under its Charter it has been made immune. The Commodity Credit Charter Act, 15 U.S.C. § 714b(c), 15 U.S.C.A. § 714b(c), provides in part as follows:

"May sue and be sued, but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Corporation or its property. * * *"

Under the Agricultural Act of 1949, the purpose of which is stated to be "To stabilize prices of agricultural commodities" (63 Stat. 1051 et seq.) the Secretary of Agriculture is authorized and directed to make available through loans, purchases, or other operations, price support to cooperators for any crop of any basic agricultural commodity, if producers have not disapproved marketing quotas for such crop, at a level not in excess of 90 per centum of the parity price of the commodity. 7 U.S.C.A. § 1441(a). By special provision, the level of support for tobacco unlike other basic commodities, is to be 90 per centum of the parity price, if marketing quotas are in effect. 7 U.S.C.A. § 1441(c). The Act provides that the Secretary shall provide the price

support therein authorized or required through the Commodity Credit Corporation and other means available. 7 U.S.C.A. § 1421(a). Concerning the manner in which the Secretary is to carry out his responsibilities under the Act, it provides in pertinent part as follows:

"* * * the amounts, terms, and conditions of price support operations and the extent to which such operations are carried out, shall be determined or approved by the Secretary". 7 U.S.C.A. § 1421(b).

In this connection, the Act also provides in part as follows:

"Appropriate adjustments may be made in the support price for any commodity for differences in grade, type, staple, quality, location, *and other factors*. Such adjustments shall, so far as practicable, be made in such manner that the average support price for such commodity will, on the basis of the anticipate incidence of such factors, be equal to the level of support determined as provided in this Act." (Italics added.) 7 U.S.C.A. § 1423.

Concerning the exercise of judgment and discretion by the Secretary under the Act, it provides as follows:

"Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act." 7 U.S.C.A. § 1429.

Among the provisions of the Commodity Credit Corporation Charter Act to be considered by the Secretary of Agriculture in making required determinations under the Agricultural Act of 1949, is Section 2 of the Charter Act which explains the creation and purposes of the Corporation as follows:

"For the purpose of stabilizing, supporting, and protecting farm income and prices, of assisting in the maintenance of balanced and adequate supplies of agricultural commodities, products thereof, foods, feeds, and fibers (hereinafter collectively referred to as 'agricultural commodities'), and of facilitating the orderly distribution of agricultural commodities, there is hereby created a body corporate to be known as Commodity Credit Corporation (hereinafter referred to as the 'Corporation'), which shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture (hereinafter referred to as the 'Secretary')". 15 U.S.C.A. § 714.

The above quoted section establishes the purpose of Commodity Credit Corporation and that it acts as the agent of the Secretary, subject to his general supervision and direction.

Under its specific powers, Section 5 of the Charter Act, the Corporation is directed to use its powers for the purpose, among others, as follows:

"Export or cause to be exported, or aid in the development of the foreign markets for agricultural commodities." 15 U.S.C.A. § 714c (f).

The decision of the Secretary to enter upon the reduced support variety program is clearly authorized by that section of the Agricultural Act of 1949, which states that adjustment may be made in the support price for differences in grade, type, staple, quality, location and other factors. The purpose of this provision of the Act is to achieve a level of support which will take into account the characteristics bearing on desirability within each commodity in order that the dollar and cents level of the support will have a direct relationship with the demand for the various characteristics present in the commodity being supported and with an average level of support, for tobacco, of 90 per centum of parity. Without such "demand value" differentiation, there would be no incentive for the production of better quality, more desirable merchandise.

Moreover, the facts show clearly that the continued production in this country of the new light-bodied varieties and the failure to distinguish between these and the standard full-bodied varieties on the auction warehouse floor would be contrary to the mandate of Congress expressed in the Agricultural Act of 1949— "To stabilize the prices of agricultural commodities" (63 Stat. 1051) and in the afore-quoted Section 2 of the Commodity Credit Corporation Charter Act. 15 U.S.C.A. § 714.

The failure to put into effect the program under consideration in this case would lead to the loss of this country's present tobacco export markets and prevent the development for additional foreign markets, contrary to the provisions in the Charter Act that Commodity Credit Corporation is to use its powers to export or cause to be exported or aid in the development of foreign markets for agricultural commodities. 15 U.S.C.A. § 714c(f).

■ In view of the purposes of the Agricultural Act of 1949, and the Commodity Credit Corporation, identifying on the warehouse floor standard varieties so as to insure that the producers thereof will be obtaining from buyers the full value of such tobacco is a proper and necessary use of the Secretary's responsibility under the Agricultural Act of 1949, "to determine or approve the amounts, terms, and conditions of price support operations." 7 U.S.C.A. § 1421 (b).

■ The procedures followed in the promulgation of the program were more than in full compliance with the Administrative Procedure Act, the pertinent provisions of which are found in 5 U.S.C.A. § 1003. Such Section provides in pertinent part as follows:

"Rule making

"Except to the extent that there is involved (1) any military, naval, or foreign affairs function of the United States or (2) any matter relating to agency management or personnel or to public property,

*loans, grants, benefits, or contracts—*

"(a) general notice of proposed rule making shall be published in the Federal Register * * *

"(b) after notice required by this section, the agency shall afford interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity to present the same orally in any manner; and, after consideration of all relevant matters presented, the agency shall incorporate in any rules adopted a concise general statement of their basis and purpose." (Italics added.)

There was published in the Federal Register May 7, 1957 (22 F.R. 3201), a notice of proposed rule making with respect to the variety identification program and the reduced level of support which would be applicable to Coker 139, Coker 140 and Dixie Bright 244 and, as a matter of law, since such program was undertaken as a price support matter as clearly shown by the authority cited and statements made in the publication, the matter related to "loans, grants, benefits, or contracts." 5 U.S.C.A. § 1003. Moreover, the rule itself, that is, the publication in the Federal Register of June 11, 1957 (22 F.R. 4064) was in accordance with the time requirement of 30 days provided for under the Administrative Procedure Act (5 U.S.C.A. § 1003 (c)).

No publication of proposed rule making was had in connection with the remaining terms and conditions of the 1957 Tobacco Loan Program and, for the reason stated above, none was required under the Administrative Procedure Act. The program itself, however, did appear in the Federal Register of July 9, 1957, (22 F.R. 4777) and it was widely known in all segments of the tobacco industry months prior thereto that, as a condition to price support, standard varieties and reduced support varieties would be distinguished on the auction warehouse floor.

The identification of varieties had no connection with the Tobacco Inspection Act (7 U.S.C.A. § 511 et seq.). Such Act provides in pertinent part as follows:

"The Secretary is authorized to investigate the sorting, handling, conditioning, inspection, and marketing of tobacco from time to time, and to establish standards for tobacco by which its type, grade, size, condition, *or other characteristics may be determined*, which standards shall be the official standards of the United States, and shall become effective immediately or upon a date specified by the Secretary." 7 U.S.C.A. § 511b. (Italics added.)

The Secretary has never established standards for tobacco on the basis of varieties as he might be entitled to do under that provision of the above quoted portion of the Tobacco Inspection Act, which permits the Secretary to establish standards for tobacco by which its "other characteristics may be determined". Under the present method of marketing tobacco, the presence or absence of flavor or aroma cannot be determined through visual inspection and it is the lack of those characteristics which make the reduced support varieties undesirable by the trade.

Moreover, the distinction, on the warehouse floor, between standard varieties and the reduced support varieties is through the attaching to the baskets of tobacco of differently designed warehouse tickets. The attaching is done by the warehouseman, or his employee, on the basis of the type of marketing card held by the producer. Such action is not a grade determination—such determination is made by the United States Department of Agriculture tobacco inspector and entered on that portion of each warehouse ticket reserved by law for such purpose.

"Warehousemen shall provide space on warehouse tickets or other tags or labels used by them for showing the grade of the lot covered thereby as determined by an au-thorized tobacco inspector under this chapter. The Secretary may prescribe, by regulation, the form in which such certification of grade shall be shown, and may require that a copy of such warehouse ticket, tag, or label shall be furnished to the Secretary." 7 U.S.C.A. § 511g.

It is clear that the relief prayed for by the plaintiffs in this action cannot be granted.

 No cause of action can arise in any one by reason of acts of a public official of a discretionary or judgment nature under statutory authority. As stated by the Court in State of Louisiana v. McAdoo, 234 U.S. 627, at page 633, 34 S.Ct. 938, at page 941, 58 L.Ed. 1506:

"There is a class of cases which hold that if a public officer be required by law to do a particular thing, not involving the exercise of either judgment or discretion, he may be required to do that thing upon application of one having a distinct legal interest in the doing of the act. Such an act would be ministerial only. But if the matter in respect to which the action of the official is sought is one in which the exercise of either judgment or discretion is required, the courts will refuse to substitute their judgment or discretion for that of the official intrusted by law with its execution. Interference in such a case would be to interfere with the ordinary function of government."

The facts show that less than one-half of one percent of the tobacco producers in the United States have the variety accorded a reduced level of support and that in South Carolina approximately one-fourth of one percent of the producers have such tobacco. The result of that which the plaintiffs in this case are seeking was recognized by the Supreme Court of the United States in Decatur v. Paulding, 1840, 14 Pet. 497, 516, 10 L.Ed. 559 and repeated in Larson v. Domestic & Foreign Corp.; 337 U.S. 682, at page 704, 69 S.Ct. 1457, at page 1468, 93 L.Ed. 1628:

272

"The interference of the Courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief."

That the plaintiffs here have no cause of action is clearly shown by the decision in United Milk Producers of New Jersey v. Benson, 1955, 96 U.S.App.D.C. 227, 225 F.2d 527, 529, United States Court of Appeals, District of Columbia. In such case, plaintiffs, producers and sellers of milk in the State of New Jersey, brought action against the Secretary of Agriculture to enjoin the application of an order promulgated by the Secretary under the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S. C.A. § 601 et seq.). The order established a formula for the prices at which distributors would account to producers for milk. Three classes were established on the same grade and quality of milk; however, the milk sold by the distributor in the New York Metropolitan Milk Marketing Area was designated as Class I–A and was accounted for to the producers at a higher minimum price than Class I–C milk which the distributor sold in the non-federal Milk Marketing Area which included New Jersey. The plaintiffs contended that, as a consequence of the allegedly unlawful price differential so established, they received a substantially lower price for their milk than would be the case in the absence of the order since the distributors purchased fluid milk outside New Jersey, paying lower prices than would apply for Class I–A milk in the New York Metropolitan Marketing Area, and would then transport the milk into New Jersey as Class I–C milk and would resell it there. Plaintiffs demanded that the Secretary be enjoined from establishing such price differentials between Class I–A milk and Class I–C milk and that the order be declared void. Plaintiffs based their standing before the Court on the claim that competition in the milk markets became especially injurious to them due to the formulation and issuance of the Secretary's order. It was held by the Court on the basis of authority cited in the decision, as follows:

"(1) that injury from lawful competition is *damnum absque injuria* and affords no standing to the party damaged to seek judicial relief therefrom, absent statutory aid to standing; (2) that competition otherwise lawful is not unlawful because made more injurious by governmental action assumed to be invalid, with possible exceptions not here relevant, so long as no legal right of the party injuriously affected is invaded, see Tennessee Electric Power Co. v. Tennessee Valley Authority, supra, 306 U.S. [118] at pages 139, 140, 59 S.Ct. 366, at page 370 [83 L.Ed. 543]; and (3) that no legal right of one in a situation comparable in all material respects to plaintiffs' is invaded by lawful competition that is facilitated by such governmental action, and thereby made more economically injurious than otherwise would be the case."

In a 1956 decision, Benson v. Schofield, 98 U.S.App.D.C. 424, 236 F.2d 719, 722, certiorari denied 352 U.S. 976, 77 S.Ct. 363, 1 L.Ed.2d 324, the Court of Appeals for the District of Columbia in ruling on an action brought by milk producers complaining of a Milk Marketing Order issued by the Secretary again reiterated the rule that "[appellees] 'to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law.' Mere loss of income in consequence of the action of Governmental or economic disadvantage, by itself, constitutes *damnum absque injuria* which does not confer standing."

The principal stated in the Schofield and United Milk Producers of New Jersey cases is decisive of the case at bar. Analysis of the plaintiffs' complaint and the evidence adduced at the hearing establishes that plaintiffs' only concern is with the fact that, by reason of the

program under which standard varieties of American tobacco and the new "light-bodied" varieties, Coker 139, Coker 140 and Dixie Bright 244, are differentiated between on the auction warehouse floor, tobaccos which are of the Coker 139 variety are required to compete with the standard varieties, under circumstances where the buyer, the ultimate arbiter of desirability, may choose without fear of error. As stated by the Court in Hall Signal Co. v. General Ry. Signal Co., 2 Cir., 1907, 153 F. 907, 908, concerning the circumstances under which a preliminary injunction is proper:

> "It is a cardinal principle of equity jurisprudence that a preliminary injunction shall not issue in a doubtful case. Unless the court be convinced with reasonable *certainty that the complainant must succeed at final hearing the writ should be denied."* (Italics added.)

The Court's view in such case, which is unquestionably applicable in the case at bar, is succinctly stated at page 909 of the opinion:

> "Sixth. The attitude of the court may be stated in a single sentence: We think the record presents too many elements of doubt to warrant the issuing of a preliminary injunction."

Moreover, the case at bar is not one involving merely private litigants and problems but one involving substantial and far reaching public questions.

The difference has been recognized. In Wing v. Arnall, Em.App.1952, 198 F.2d 571, 575, the Court, in this connection, stated as follows:

> "When the public interest is involved courts of equity require much stronger grounds for granting temporary relief than they are accustomed to require when only private interests are involved."

The Court in Wing v. Arnall, 198 F.2d 571, at page 574 of the opinion also made a statement which is peculiarly applicable to the case at bar:

> "It is apparent that in the case of an application such as this, for a temporary injunction against the enforcement of a price regulation of general applicability the complainants do not seek to preserve the status quo but rather to change it in their own interest. It is equally clear that such a change, which would necessarily involve the temporary lifting of the price ceiling in question throughout the United States, might have repercussions in the economy of the nation which it would be impossible to calculate in advance and which would inevitably affect the public interest adversely in ways which could not possibly be compensated by an injunction bond."

From the foregoing it is quite clear that the rule to show cause should be dismissed and the injunction denied. It is quite clear also that this Court does not have jurisdiction of Ezra Taft Benson, Secretary of Agriculture of the United States, who is an indispensable party, and the motion to dismiss the complaint should be granted.

And it is so ordered.

NOTE. The Government submitted a brief through Thomas P. Simpson, Esquire, Assistant United States Attorney, which in my opinion correctly stated the facts and the law involved in this case. I have therefore used the statements made in this brief with few changes.