**James W. MITCHELL, Jr. et al., Plaintiffs,**

v.

**John R. BLOCK, Secretary, U.S. Department of Agriculture, Defendant.**

**Civ. A. No. 82–0311–A.**

United States District Court, W.D. Virginia, Abingdon Division.

Dec. 2, 1982.

1012

J.D. Morefield, Abingdon, Va., Ford C. Quillen, Gate City, Va., H. Ronnie Montgomery, Jonesville, Va., for plaintiffs.

Morgan E. Scott, Asst. U.S. Atty., Abingdon, Va., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

The plaintiffs are burley tobacco farmers in various counties in Southwest Virginia who have marketed and/or intend to market burley tobacco on burley tobacco markets located in Southwest Virginia. The plaintiffs brought this action on behalf of themselves and all other burley tobacco farmers similarly situated. The court allowed several residents of the State of Tennessee, all of whom are burley tobacco growers, to intervene as amici curiae for the purpose of filing a brief in support of the plaintiffs. The defendant is John L. Block, the Secretary of the United States Department of Agriculture.

This matter first came before the court on November 16, 1982 upon the plaintiffs' motion for a preliminary and permanent injunction filed pursuant to Rule 65(a) of the Federal Rules of Civil Procedure. The

plaintiffs seek to enjoin the defendants from failing or refusing to grade and provide price support for burley tobacco marketed in sheets on tobacco markets in Southwest Virginia. The court issued a temporary restraining order on November 16, 1982 which order continued until November 22, 1982. On November 22, 1982, this cause came to be heard upon the plaintiffs' motion for a preliminary injunction and upon the defendant's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Additionally, at the November 22 hearing, the defendant made an oral motion to dismiss asserting that an injunction may not issue against the Secretary of Agriculture in any action based upon a claim by or against the Commodity Credit Corporation. The court continued the temporary restraining order until December 2, 1982, the date of this decision.

## I. FINDINGS OF FACT

This dispute arose over the issue of whether the United States Government would offer price support through the Commodity Credit Corporation for burley tobacco prepared for market on burlap sheets. Very simply stated, price support, under the No Net Cost Tobacco Program Act of 1982, is a means by which farmers are guaranteed that their tobacco will be bought under the price support program at a certain minimum price if the tobacco is not purchased at market by industrial tobacco buyers. The farmers underwrite the program themselves in that each farmer contributes one cent per pound of tobacco sold to a price support fund. The United States Government purchases the unsold tobacco and then is reimbursed through the fund. Evidence at the November 22 hearing indicates that tobacco which is not covered by price support sells for a lower price than tobacco covered by price support because the farmer must accept whatever price he is offered for the tobacco. Additionally, tobacco which is marketed in sheets receives an inspection grade of "no grade" by the United States Department of Agriculture inspectors which also tends to lower the sale price of the tobacco.[1]

Historically, burley tobacco has been marketed in a manner referred to as "tied in hands." On October 15, 1981, the Department of Agriculture announced that burley tobacco untied in bales, as well as burley tobacco tied in hands, would receive official standard grades and price support for the 1981–82 sale season. The Department of Agriculture also acknowledged that several commentators had requested that tobacco marketed in loose-leaf form be graded and therefore eligible for price support for the 1981–82 season but that time limitations prohibited implementation of such a program for the 1981–82 season and that price support for burley tobacco marketed in loose-leaf form will be considered for the 1982 season. 46 Fed.Reg. 48,900 (1981).

On April 26, 1982, the Agricultural Marketing Service and the Commodity Credit Corporation issued an advance notice of proposed rule making and a request for public comment in regard to, among other

---

1. The plaintiffs also state that under the Omnibus Budget Reconciliation Act of 1981, each farmer was charged $.0045 per pound for mandatory inspection and grading of all quota tobacco marketed for sale. Pursuant to a final rule adopted by the Agriculture Marketing Service on November 17, 1982, this charge was increased to $.0055 per pound. Plaintiffs argue that when Government inspectors assign a designation of "no grade" to burley tobacco marketed in sheets, the tobacco has not been graded and therefore, the farmers are not getting the grading for which they have paid.

Although this argument is enticing, the plaintiffs contention is erroneous. A designation of "no grade" by a Government tobacco inspection is a grade as defined by 7 C.F.R. § 39.3040. No grade or No–G indicates that the tobacco is nested, abnormally dirty, contains foreign matter, or "rework" tobacco. "Rework" tobacco is tobacco that is not properly prepared for market. Tobacco which is tied in hands or in bales is stated to be properly prepared for market. 7 C.F.R. § 29.3050.

"No-Grade" is a misnomer in that it does not mean that the tobacco is ungraded; rather, "no-grade" or "No–G" describes a condition of the tobacco.

things, the marketing of burley tobacco in loose-leaf form on sheets and the availability of grading and price support for burley tobacco so marketed. The public was further instructed that comments should be filed not later than May 24, 1982. The following statement was contained in the release:

If it is determined to be in the public interest to proceed further after consideration of the available data and comments received in response to this notice of proposed rule making will be issued in sufficient time for producers to make plans for the 1982–83 tobacco marketing season.

47 Fed.Reg. 17,826 (1982).

On July 20, 1982, Congress enacted Public Law 97–218, entitled "No Net Cost Tobacco Program Act of 1982" the stated purpose of which is:

To provide for the operation of the tobacco price support and production adjustment program in such a manner as to result in no net cost to taxpayers, to limit increases in the support price for tobacco, and for other purposes.

Public Law 97–218 in effect authorized the Secretary of Agriculture and his agents from time to time, as necessary, to require producers of quota tobacco (burley tobacco is quota tobacco), as a condition of receiving the benefits of price support for their tobacco, to contribute to a capital account in such amounts as determined by the Secretary of Agriculture or his agents necessary to achieve a no net cost tobacco program. In effect, the contribution of each farmer pays for price support for all farmers and there is no cost to the taxpayers via the United States Treasury.

On September 9, 1982, the Agricultural Marketing Service published proposed rules which would provide farmers official grading for burley tobacco offered for sale at auction untied on burlap sheets beginning with the 1982–83 marketing season in view of overwhelming support of the proposal thereby providing farmers with an economical alternative for the marketing of their tobacco. Further public comment was requested to be filed no later than October 8, 1982. The publication further stated:

William T. Manley, Acting Director, Tobacco Division, Agricultural Market Service, has determined that an emergency situation exists which warrants less than a 60 day comment period of this proposal because all segments of the burley industry must be informed of any changes affecting marketing process prior to the opening of the marketing season and producers must be provided substantial lead time to decide on the method in which they will market their tobacco. Therefore, a 30 day comment period will be provided on this proposal.

47 Fed.Reg. 39,688 (1982).

On or about September 27, 1982, local Agricultural Stabilization and Conservation Service Offices in Southwest Virginia mailed explanatory letters to all Southwest Virginia farmers with burley tobacco quota in regard to the No Net Cost Tobacco Program Act of 1982 and form MQ–40–1. The MQ–40–1 is a contractual agreement between the United States Department of Agriculture and the particular farmer authorizing the Commodity Credit Corporation to receive one cent per pound of burley tobacco marketed and sold as a prerequisite for the farmer to receive price support for burley tobacco which is marketed.

Burley tobacco farmers began preparing their burley tobacco crops for market in early October, 1982. Burley tobacco marketing cards were mailed to each farmer by the local Agricultural Stabilization and Conservation Service Offices on or about November 1, 1982. The cards designated whether or not the farmer had signed the MQ–40–1 form and thus whether the farmer was eligible for price support.

Tobacco warehouses in Southwest Virginia began receiving burley tobacco on November 8, 1982. The 1982–83 burley tobacco sale season began on November 17, 1982.

The Department of Agriculture issued a press release on November 8, 1982, that burley tobacco marketed untied and in sheets would not be graded or receive price

support. At the time of the release, a substantial amount of tobacco packaged in sheets had already been prepared for the market, or had already been placed on the warehouse floor. Farmers testified that they had prepared their tobacco in sheets in reliance on the proposed regulation, form MQ–40–1, and the opinion of certain tobacco warehousemen that sheet tobacco would receive price support for the 1982–83 season. The rules and regulations promulgated by the Secretary of Agriculture implementing the position of the Department of Agriculture, that burley tobacco marketed in sheets would not be eligible for a grade, were published in the Federal Register on November 17, 1982. 47 Fed.Reg. 51,719 (1982). The rules were promulgated under the Tobacco Inspection Act of 1935, 7 U.S.C. § 511 (1976).

## II. CONCLUSIONS OF LAW

There are two basic issues before the court at this time.[2] First, the defendant raises the issue of whether the court is prohibited from granting either a preliminary or permanent injunction in the action under 15 U.S.C. § 714b(c). If the court is not prohibited from granting injunctive relief under this statute, the issue then becomes whether the plaintiffs have satisfied the prerequisite showing to entitlement for a preliminary injunction.

### A. The Court's Power to Issue an Injunction

The defendant asserts that the court is prohibited from granting an injunction in this action under 15 U.S.C. § 714b(c) (1976) which states:

> The corporation [m]ay sue and be sued, but no attachment, injunction, garnishment, or similar process, mesne or final, shall be issued against the corporation or its property . . . . Any suit by or against

the United States as the real party in interest based upon any claim by or against the corporation shall be subject to the provisions of subsection (c) of this section to the same extent as though such suit were by or against the corporation . . . .

Further, Section 2 of the Commodity Credit Corporation Act provides that the Commodity Credit Corporation:

> . . . shall be an agency and instrumentality of the United States, within the Department of Agriculture, subject to the general supervision and direction of the Secretary of Agriculture.

15 U.S.C. § 714 (1976).

■ The defendant argues that the Commodity Credit Corporation is an indispensable party with respect to price support activities and, therefore, the plaintiffs cannot obtain injunctive relief against the Secretary of Agriculture since they cannot obtain injunctive relief against the Commodity Credit Corporation. The court finds however that the Commodity Credit Corporation is neither a party nor an indispensable party to this action. The court is not enjoining the Commodity Credit Corporation to do or to refrain from doing an act, but is directing the Secretary of Agriculture and those acting under him from alleged arbitrary and capricious conduct which may have misled tobacco farmers. There is no language in the statute relied upon by the plaintiffs which would estop the court from enjoining the Secretary from doing an arbitrary and capricious act.

Courts have universally assumed jurisdiction for injunctions against the Secretary of Agriculture. See Price v. Block, 535 F.Supp. 1239 (C.D.N.C.1982); Warr v. Butz, 379 F.Supp. 268 (S.C.1974); Lazar v. Benson, 156 F.Supp. 259 (D.S.C.1957). In Lazar, which is relied upon by the defendant,

2. It is also argued by plaintiffs that a substantive rule cannot go into effect less than 30 days after publication. 5 U.S.C. § 553(d). Therefore, the rule at issue not being published until November 17, 1982, price supports on sheeted tobacco would automatically continue until December 17, 1982. Thus, it is argued, the market would become congested as farmers rushed to get tobacco marketed prior to the effective date of the rule and an injunction should be issued requiring price supports throughout the 1982–83 marketing season. This argument is without merit since the rule issued on November 17, 1982 merely negates the proposed rule of September 1982 and does not create a right to the power.

tobacco raisers brought action to enjoin the Secretary of Agriculture, the Commodity Credit Corporation, and tobacco warehousemen from attaching warehouse tickets to tobacco which distinguished between tobacco receiving price support and tobacco not receiving price support. *Id.* at 261. The court dismissed the action against the Commodity Credit Corporation because of "express statutory provision" (15 U.S.C. § 714b(c)) immunizing the corporation from an injunction. *Id.* at 262. The court did not grant the same 15 U.S.C. § 714b(c) statutory immunity to the Secretary of Agriculture.

One must focus upon the relief sought by the plaintiffs. The Secretary is empowered to promulgate rules concerning the manner in which tobacco is inspected and graded. 7 U.S.C. § 511(b) (1976). The Secretary has ruled that a designation of "no grade" is to be assigned to lots of tobacco which are not marketed in bales or hand-tied. Tobacco which receives a "no grade" designation is not, in the Secretary's opinion, eligible for auction on the tobacco market floor and, therefore, is not eligible for price support. Price support is available to farmers whose tobacco receives a satisfactory grade and who have agreed to pay one cent per pound for price support through the Commodity Credit Corporation. It is the receipt of a grade, assuming other conditions are met, which triggers the right to price support. Accordingly, the relief sought in this action is injunctive relief against the Secretary for his alleged arbitrary and capricious act, under his rule-making authority, of leading the farmers to believe that sheeted tobacco would receive a grade and then denying the grade.

■ The court is empowered under the Administrative Procedure Act, to compel agency action unlawfully withheld or unreasonably delayed and to set aside agency action found to be arbitrary and capricious. 5 U.S.C. § 706 *et seq.* (1976); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). The mere fact that the plaintiffs would be entitled to price support vis-a-vis the Commodity Credit Corporation should they prevail in their quest for injunctive relief entitling sheet tobacco to be graded, does not clothe the Secretary with the Corporation's immunity from injunction. Therefore, the court is in no way estopped by 15 U.S.C.

§ 714b(c) from issuing an injunction against the Secretary.

B. *Criteria for a Preliminary Injunction*

*Blackwelder Furniture Company of Statesville, Inc. v. Seilig Manufacturing Company,* 550 F.2d 189 (4th Cir.1977), states the conditions which a petitioner must satisfy in this Circuit to demonstrate entitlement to preliminary injunctive relief:

> [T]he first step in a Rule 65(a) situation is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:
>
> > [I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953).
>
> \* \* \* \* \* \*
>
> If the balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered.

550 F.2d at 195, 196.

1. *Likelihood of Harm to the Defendant*

The evidence in this case fails to disclose any harm to the defendant as the result of granting a temporary injunction. There is no financial harm to the Government since Congress enacted Public Law 97–218, entitled "No Net Cost Tobacco Program Act of 1982," in which the tobacco farmers underwrite the price support program and not

the Government. Furthermore, the evidence in this case shows that as regarding the work of Government graders who grade the tobacco, no more time or cost is expended in putting a "no-grade" on the tobacco, than placing a grade. The farmers pay for the cost of grading as they are charged fifty-five cents on each basket of tobacco, and the farmers also pay one cent per pound to go into a fund to pay for the price support program. Should there be a deficit in the amount of money available to purchase the tobacco which is not bought on the open market, but is taken for the support price, the cost of price support is increased to the farmer in future years to make up the deficit.

### 2. *Likelihood of Irreparable Harm to the Plaintiffs*

The defendant argues that if the plaintiff suffers any harm at all, the harm is monetary for which there are adequate remedies at law. The evidence does show that the plaintiffs' injury is monetary; however, this fact does not necessarily establish the plaintiffs' entitlement to relief at law or preclude the granting of an equitable remedy.

It would be extremely difficult, if not impossible, for the plaintiffs to establish the amount of their damages with any degree of legal certainty. Market prices for burley tobacco fluctuate from day to day. Additionally, because the Government assigns a grade of "no grade" to the sheeted tobacco, there is no record of the quality of tobacco; again adding to the speculative nature of ascertaining what price the tobacco would have brought under price support. Since the amount of damages is so speculative, it is possible that the plaintiffs would not have an adequate remedy at law. Even if the plaintiffs could prove the amount of their losses to a degree of certainty that would satisfy a court of law, it is questionable whether a judgment could be entered against the defendant because of certain immunity defenses. Therefore, absent in-

junctive relief, the plaintiffs would be irreparably harmed in that they may be unable to recover their losses in a court of law.

An even greater consideration in evaluating the extent of the farmers' harm, is the fact of the farmers' overwhelming financial dependence on the income from the sale of their tobacco crop. The affidavit of Kenneth Givens, a farmer and the Vice President of Citizens Union Bank of Rogersville, Tennessee, indicates that for some farmers, tobacco sales account for eighty percent of their total annual income. The tobacco farmer who is a tenant often lives on credit and depends on the money received from the sale of tobacco to pay his creditors. The landlords and farmers working their own land depend upon this cash crop to make payments on mortgages and equipment. The evidence shows that the financial loss to all farmers would be disastrous and could result in the bankruptcy of many. For these reasons, the court is of the opinion that the plaintiffs have made out a case of irreparable harm.

The defendant raises a unique argument in this case as a defense to the plaintiffs' claim of irreparable harm. The defendant argues that the plaintiff's harm is a result of their own misconduct in relying upon a rule-making procedure when the rule had not been adopted. Additionally, he argues that the farmers could minimize their damages by taking their tobacco off the floor, tie it in hands and put it back on the floor to be sold.

The court is of the opinion that the evidence in this case shows that the Government cartamicuously misled the farmers into believing that sheeted tobacco would receive price supports for 1982 and that such support would have been given had it not been for the fact that it began to appear that an unusually large amount of burley tobacco would be received by the "pool" of the Commodity Credit Corporation.[3]

**3.** "Pool" is a term used to describe that tobacco that has come under price support and has

been "purchased" by the price support fund.

As early as October 15, 1981, it was publicly announced that burley tobacco, untied in bales, would receive official standard grade and price support for the 1981–82 sale season. The announcement also stated that tobacco marketed in loose-leaf form would have been eligible for price support for the 1981–82 season but that time limitations prohibited implementation of such a program and that the program would be considered for the 1982 season.

On April 26, 1982, in the Federal Register, the Agriculture Marketing Service and the Commodity Credit Corporation requested public comment on whether marketing of burley tobacco in loose-leaf form on sheets was desirable. The comments were requested to be filed not later than May 24, 1982. The proposed rule was issued on September 9, 1982 allowing further public comment until October 8, 1982. The proposed rule stated that there was overwhelming support for the proposal which would provide farmers with an economic alternative for the marketing of their tobacco.

On September 27, 1982, the local ASCS offices in Southwest Virginia mailed letters to all Southwest Virginia burley tobacco farmers in regard to the No Net Cost Tobacco Program Act of 1982 with a form number MQ–40–1. Each farmer, by signing this agreement with the Department of Agriculture, agreed to have one cent per pound taken from his price received for the tobacco in order to receive price supports.

Therefore, the proposed rule, together with the agreement to pay for price supports, tended to lead farmers to believe that sheeted tobacco would receive price supports. The proposed rule was not withdrawn in the Federal Register until November 17, 1982 at which time farmers had been preparing their crops for market for a period of five weeks, and tobacco was already on the floors of the warehouses. While there was a press release issued on November 8, 1982, the farmers who testified had certainly not received information through the press release.

The court is of the opinion that farmers were misled into believing that sheeted tobacco would receive price support. The defendant's reliance on this defense is misplaced.

As to the defendant's argument that the farmers could have mitigated their damages by taking the tobacco off the floor and reworking it, the evidence is conflicting as to just how expensive this would be. The cost of reworking of the tobacco would depend on weather conditions, the availability of labor, and whether the farmer could get the tobacco back on the market in time to have it sold. It is problematical as to whether or not reworking the tobacco is a reasonable remedy for the farmers.

### C. *Public Interest*

Finally, it is argued on behalf of the Government that the granting of injunctive relief would be a penalty to farmers who have baled their tobacco or tied it in hands. If price support is available for sheeted tobacco, more tobacco may be taken into the "pool" of the Commodity Credit Corporation which could result in a deficit in the fund thereby requiring a greater contribution to the fund next year by all farmers. The court has reviewed the evidence in this case and finds that the testimony is that on the entire burley market, approximately twenty-five percent of the crop is being taken into the "pool" this year. There is no indication that a greater percentage of sheeted tobacco is being taken into the pool than tobacco that is marketed by other methods. The court finds that the evidence is inconclusive in this case to show that those farmers who have marketed their tobacco in the more traditional way are being penalized in any way and the public interest is being harmed.

### III.  CONCLUSION

#### A. *Preliminary Injunction*

◼ The court is of the opinion that the plaintiffs have shown that they will suffer irreparable harm if a preliminary injunction is not granted. Additionally, the public interest would be served by the issuance of the injunction and neither the Government nor any defendant would be harmed.

Therefore, the plaintiffs' request for a preliminary injunction is hereby granted until December 29, 1982, at which time, this court will conduct an evidentiary hearing on the issue of whether a permanent injunction should issue as set forth below.

The court notes that it does not have the power to promulgate rules. The rule-making authority exists with the Secretary of Agriculture. Further, the court does not intend to mislead farmers into believing that this court has endorsed sheeting as a proper method of marketing tobacco. The granting of the preliminary injunction is to protect the farmer who has already prepared his tobacco for market from undue hardship. Farmers must be aware that this preliminary injunction will not be in effect when the tobacco market reopens after the Christmas break and must make their decisions as to which method to use in marketing their tobacco accordingly.

## B. *Permanent Injunction*

While no evidence has been presented to the court, and the arguments and briefs of plaintiffs and defendant have not focused on it, this court is seriously concerned with the effect of the "No Net Cost Tobacco Program Act of 1982" 97 Public Law 218, on the entire price support program. Upon reading this Act, the question arises as to whether Congress intended to impose any other requirement upon a farmer to receive price supports other than to produce within quota and to "contribute to a capital account to be established," which account is to be "used by the associations exclusively for the purpose of achieving a no-net cost tobacco program." The Act details the manner in which the Secretary shall carry out the Act and the conditions thereof; provides penalties to farmers and warehousemen who fail to comply with the Act; and provides that "the Secretary shall issue regulations necessary to carry out the provisions of this section."

According to the evidence presented thus far in this case, the Secretary has only made two decisions with regard to the Act and the court has not determined whether these are regulations or not. First, the Secretary has determined the amount to be paid by the farmer (one cent per pound) which apparently applies to all types of tobacco, including burley, and the Secretary has required the local ASCS offices in the various counties to mail Form Number MQ–40–1 (Pl.Ex.1) to all farmers. This form is labeled "Agreement for Contribution to No Net Cost Tobacco Account." When this form was signed by farmers, the farmers became bound by its terms as follows:

> If such tobacco is marketed by sale, such contribution shall be withheld from the proceeds from the sale of such tobacco.

The old price support program and all regulations premised thereunder are based on the fact that the Federal Government (the taxpayers) was paying for the entire price support program. Now, the farmer underwrites the program and under this act, no regulations have been promulgated and no conditions are imposed on the farmer except to sell within the quota and pay into the no-net cost account.

Has the Secretary, by not promulgating regulations pursuant to the new act, not left the conditions in the act as the only conditions for price supports? If such is the case, the plaintiffs may be entitled to a permanent injunction. Therefore, an evidentiary hearing is hereby scheduled at Abingdon, Virginia, at 9:30 o'clock, a.m. on the 29th day of December, 1982. In the interim, the parties are hereby invited to submit additional briefs on any questions advanced in this opinion.

The Clerk of this court is directed to send certified copies of this Memorandum Opinion to counsel of record.